## FREEMAN & FREEMAN OIL CO. et al. v. LYMAN.

### No. 12451.

Court of Civil Appeals of Texas. Dallas.

Oct. 8, 1938.

Rehearing Denied Nov. 5, 1938.

W. J. Rutledge, Jr., of Dallas, for appellants.

Thompson, Knight, Baker, Harris & Wright, J. Hart Willis, and Sol Goodell, all of Dallas, and Joe S. Gambill, of Denton, for appellee.

LOONEY, Justice.

H. E. Lyman sued Freeman & Freeman Oil Company, a corporation, Fred Freeman and Wayne Freeman claiming damages for the alleged breach of a contract, whereby plaintiff leased to defendant company a drilling rig that, at the time was being used in drilling for oil on a lease located in Denton County, Texas, belonging to the defendant.· Fred and Wayne Freeman were sued as guarantors of the faithful performance of the lease contract by the company.

Prior to the execution of the contract sued on, plaintiff had leased the drilling rig to S. J. Alexander, who was using same in drilling for oil under a contract with Fred and Wayne Freeman; this contract being terminated on March 4, 1932, by mutual agreement, plaintiff leased the rig to defendant company to be used in completing the well begun by Alexander.

The lease of the rig was to continue during such time as the lessee "shall be diligently using the same in connection with the completion of the well on·said leasehold now under construction"; lessee agreeing to "diligently pursue the continuation of the drilling of the well, obligating itself to keep said rig and machinery in good and usable repair during the life of the contract, except damages by fire and the elements * * *, and when said well shall have 'been completed to a depth of 3500 feet * * * said well shall be considered complete * * *." After reciting the consideration moving to the lessor, the contract concludes as follows: "It is further agreed between the parties that at the termination of this lease contract first party will thoroughly clean and paint said rig and will, if requested by second party, upon being notified by first party that said well is finished, tear said rig down and stack the same in good and workmanlike manner on the premises and will give free storage unto second party or his order on said premises for a period of 90 days after the same has been so torn down and stacked. First party will use due diligence and care to protect said machinery from theft or other damage but shall not be responsible to second party therefor unless such theft or damage is the result of negligence of first party * * *." Full, complete and faithful performance of the contract by the company was guaranteed 'in writing by Fred and Wayne Freeman.

Plaintiff alleged, among other things, that the defendant "did not diligently pursue the continuation of the drilling of the well under construction, did not keep said rig and machinery in good and usable repair during the life of the contract, did not upon completing the well clean and paint said rig, did not though requested by plaintiff tear down said rig and stack it in good and workmanlike manner, did not use due diligence and care to protect same from damage, wrongfully refused to deliver same to plaintiff upon the completion of the well and termination of the lease period * * *"; alleged that, the value of the rig was $15,000 when it was delivered to the defendant, and that its reasonable rental value was $1,000 per month; that, if defendant had diligently drilled, the well could have been completed by June 1, 1932, and that, after the termination of the lease period, plaintiff repeated-

ly requested defendant to tear down, paint and stack said drilling rig, which it failed to do, and refused to deliver same to plaintiff or his agents, or to permit removal of same; and that, by reason thereof, plaintiff was wrongfully and unlawfully deprived of the use of the rig from about June 5, 1932, until on or about October 5, 1933, to his damage of $6,000. Plailntiff also specifically alleged that: "b. Defendants in breach and violation of their said contract, did not keep said drilling rig and its appurtenances in good and usable repair during the life of the contract and did not use diligence and care to protect same from damage, as is more particularly set forth hereinafter. Defendants damaged and ruined the swivel, allowed the drilling line to be rusted, damaged and destroyed, and damaged, ruined and destroyed several joints of drill stem, the mud hose and pump, the twin engines of the motor, two water pumps, the boiler, boiler flues and all machinery thereof, pipes, and numerous other parts of the rig, the items of which are well known to defendants. In addition, when plaintiff retook possession of the same, all of the tools and much equipment, the items of which are well known to defendants, were missing. This loss and damage was not caused by reasonable wear and tear, or by fire, or the elements, but by the willful acts of defendants, or their negligence and failure to use ordinary care by failing properly to handle the said rig, and its appurtenances, by their failing to continue to operate, use and care for the same while it remained in their custody, by their failure to paint, tear down and stack same, by their permitting it to remain exposed to inclement weather without draining the engines and pipes, and allowing the water in same to freeze and burst said engines and pipes, and by their permitting the tools, appurtenances and equipment to lie in mud and slush, despite repeated requests of plaintiff to tear down, paint and stack said rig made on or about June 2, June 15, July 12, July 15, August 8, August 25, September 21 and November 19, 1932, all of which requests and demands defendants ignored. As a direct result of the aforesaid breaches of contract on the part of defendants, said drilling rig and its appurtenances, when it was surrendered to plaintiff had declined in value, so that instead of being worth $15,000.00 as it was when plaintiff delivered it to defendants, it was at such time at Denton, Texas, of the reasonable cash market value of $7000. As a direct result of the breaches of contract mentioned in this sub-paragraph, plaintiff sustained damages equal to the difference between the amount the rig should have been worth had defendants not breached their contract as aforesaid, and the actual value of the rig when surrendered to plaintiff— $8000.00, plus interest thereon at the legal rate from the date defendants ceased to deprive plaintiff of possession of said rig."

On August 8, 1932, the defendant notified plaintiff that the well had been completed, and that the drilling rig was subject to his order; however, although repeatedly requested by plaintiff to do so, the defendant' company failed to clean and paint the rig, or to tear it down and stack the parts in a good and workmanlike manner, as provided in the contract.

The jury having found that, there was no failure on the part of the defendant to diligently drill prior to the completion of the well on August 8, 1932, or had refused to permit plaintiff to remove the rig, these issues passed out of the case. Although the jury found that, the defendant failed to keep plaintiff's rig and machinery in reasonable repair, during the period of drilling from March 4, 1932 to August 8th of that year, and that, plaintiff was damaged $750 as the result of such failure, yet plaintiff having voluntarily remitted this item of damages, that issue also passed out of the case. However, the jury found that, the defendant company failed to either clean, tear down, paint or stack plaintiff's rig, according to contract, and that, as a result of such failure, he was damaged $7,500, for which amount the court rendered judgment against the defendants, from which they appealed.

■ At the outset, plaintiff insists that, defendants' brief should not be considered, except insofar as it may call attention to fundamental error, because it is in violation of the rules of briefing. The brief contains a mass of materials, evidencing the expenditure of great labor in its preparation, but the contents are not arranged orderly or systematically, as required by the rules. The brief contains 28 assignments of error, presenting unrelated questions, is without propositions, only one list of authorities, one statement, extending through 140 printed pages, and one argument of 28 pages. The method of briefing pursued is condemned, yet as the decisive question (the only one considered)

is definitely raised by assignments and readily presents itself—that is that, the verdict of the jury, upon which the court based its judgment, is grossly excessive, and was not authorized by evidence—in our opinion, may be reviewed and disposed of in the light of the statement made, hence the brief will be considered for the purpose of reviewing the question mentioned.

The evidence tending to show any injury or damage to the rig, or parts thereof, attributable to the failure of the defendant to cleanse, dismantle, paint, stack, etc., the parts, is exceedingly vague, indefinite and unsatisfactory. The record contains an abundance of opinion evidence, to the effect that the rig was reasonably worth $15,000 when it was turned over to the defendant in March 1932, and that when sold by the plaintiff in October 1933, its value did not exceed $7,500. But, we think it obvious that the witnesses who testified in regard to the reduced value of the rig, based their opinions, not exclusively upon the diminution in value caused by the failure to cleanse, tear down, paint, stack, etc., but upon the general condition of the rig, from whatever cause. There is some evidence to the effect that, if cleansed, torn down, etc., the rig would sell for a better price; also that, if left standing for a year, it would depreciate in value, but the extent of such depreciation was not shown; neither was it shown how much it would have cost to cleanse, tear down, paint and stack, etc. However, defendant Wayne Freeman testified (without contradiction) that it would have required only a gallon of paint and a day's work for one man to paint the required parts.

Fairly illustrative of testimony favoring the contention of plaintiff, is that of the witness Overmeyer, who testified that he saw the rig in operation on the Denton County lease early in 1932; that it was then in good condition and of the reasonable value of $15,000; that he saw the rig again about one year later in the same position as before; that the swivel used the year before had been drug off to one side, the drill line was out by the fence and was worthless; drill pipe was laying on the ground, some of it damaged, threads mashed, some of the pipe had been dropped, one of the boilers was in bad shape, flues frozen, bursted and swelled up; another boiler had been leaking and the flue tips were short and, in his opinion, the rig at that time was worth only $7,500. However, it was not shown that the damaged condition of these parts was caused by or had any relation to the failure of the defendant to cleanse, tear down, paint etc., hence the diminution in value testified to by this witness must have resulted from other causes.

The witness Beckner was familiar with the rig, having directed its operations during the drilling of the last 200 feet (August 1932), testified that at that time the rig was in good condition and of the reasonable value of from $15,000 to $20,000; that, on February 20, 1933, he inspected the rig with the view of purchasing, and at that time found the mud end of the big mud pump bursted and severed from the stud bolts; that the boiler end of the pump was frozen and the engine manifold had a light crack in it as the result of freezing. He expressed the opinion that, at that time the rig was not worth exceeding $5000. It may be assumed, although it was not made to appear that the injuries mentioned by this witness would not have occurred, if the rig had been taken down, painted, stacked etc.; yet, the reasonable cost of repairing or replacing these parts was not shown and, in our opinion, it is inconceivable that the damage resulting from these injuries alone could have reduced the value of the rig from $15,000 or $20,000 to only $5,000. So, we think the conclusion inescapable that, such evidence either, is an imperfect guide to the truth, or else is based chiefly upon defects due to causes other than the failure of the defendant to dismantle the rig, stack and paint the parts.

The defendant company having failed to perform its contractual obligation to dismantle the rig, cleanse, paint and stack its parts, plaintiff was entitled to recover all damages directly resulting from such breach. However, for reasons heretofore indicated, we are of opinion that the verdict of the jury awarding $7500 damages is grossly excessive, and, for that reason only, the judgment of the court based thereon should be reversed. So, in this situation, it becomes our duty to indicate to plaintiff the amount of the excess so as to afford him an opportunity, by remitting the excess, to have the judgment reformed and affirmed. See Harris & Co. v. Caldwell, Tex.Civ.App., 276 S. W. 298, 301; Texas & N. O. Ry. Co. v. Stevens, Tex.Com.App., 24 S.W.2d 9. All

other assignments urged by the defendant are overruled.

 As before stated, the evidence as to the damages resulting from the failure of the defendant to comply with the lease contract in the · respect mentioned, is vague, indefinite and unsatisfactory, yet the record is not altogether without a .guide, indicating the amount of damages plaintiff himself thought he had suffered, or at least the amount for which he was willing to settle before filing suit. The record discloses that, in the fall of 1933, Dr. Lyman visited the rig before it was dismantled and spent about .30 minutes inspecting it, but at the trial failed to. testify to any injury to the rig or its parts that resulted from the failure of defendant to dismantle, cleanse, paint or stack the parts, etc. Fred Freeman testified that, in 1934, prior to the institution of the suit, Dr. Lyman came to see witness, demanded the payment of $500, being the amount of a hospital bill and a claim in regard to an insurance matter, threatened suit unless he was paid that amount, but made no other claim. Dr. Lyman corroborated the testimony of Fred Freeman (see pp. 416, 417 s.f.) saying: "If you will just give me $500 I will forget the thing rather than to go into a law suit and have trouble."

Having reached the conclusion that the judgment is excessive to the extent of $6,750, the clerk is directed to notify the plaintiff or his attorney of record that, this court holds the verdict and judgment excessive as above mentioned, and that plaintiff is privileged to file among the papers of this cause, on or before Saturday October 22nd, 1938, a remittitur of $6750; and, if filed within the time mentioned, the judgment of the trial court will be reformed and as reformed, affirmed; or, if the remittitur is not filed, as indicated, the judgment of the trial court will be reversed and the cause remanded for further proceedings.

Affirmed, conditionally.

## On rehearing.

 After duly considering the grounds urged by appellee for rehearing and his alternative plea that, the court set aside. its suggested remittitur, and in lieu, fix a less amount, the same are overruled; and appellee having failed, within the time prescribed to file the remittitur suggested, the judgment of the trial court is reversed and the cause is remanded for further proceedings.

Reversed and remanded.